DAVIS, Judge.
Avante at Boca Raton, Inc.; Avante at Inverness, Inc.; Avante Villa at Jacksonville Beach, Inc.; Avante at Lake Worth, Inc.; Avante at Leesburg, Inc.; Avante at Melbourne, Inc.; Avante at Mt. Dora, Inc.; Avante at Orlando, Inc.; Avante at Or-mond Beach, Inc.; and Avante at St. Cloud, Inc. (collectively, the Nursing Homes), challenge the final judgment entered after jury trial in favor of Senior Care Pharmacy of Florida, LLC. The final judgment awarded Senior Care $1,608,104.72 on a breach of contract claim. We reverse and remand.
Senior Care is a pharmaceutical company that sells medications and related services to nursing homes, assisted living facilities, and specialty care assisted living facilities. Each of the Avante Nursing Homes entered into a separate contract with Senior Care for the purchase of medications needed for their nursing home residents.[1] Senior Care performed pursuant to the contracts by delivering medications to the Nursing Homes and invoicing the Nursing Homes accordingly. And initially, the Nursing Homes paid the invoiced amounts.
However, there came a time when the Nursing Homes stopped paying the invoices, complaining that they were being overcharged. The parties met and entered into a.stipulation whereby the Nursing Homes would immediately pay Senior Care $470,000 in at least partial payment of their obligation and, in return, Senior Care would provide the Nursing Homes with the necessary documents to determine what remaining amount, if any, they owed under the contract. During these *876 discussions, it became obvious to the parties that they had a difference of opinion as to what the contract term describing the price to be charged actually meant.
The contract specified that Senior Care would charge and the Nursing Homes would pay the “Pharmacy’s current usual and customary charge to Medicaid.” Senior Care understood this to mean that the contract price would be the normal charge that Senior Care would invoice when Medicaid was to pay for a prescription whether or not Medicaid actually paid the full amount of the invoice. The Nursing Homes’ position was that .this term, as used in the industry, meant that the contract price was to be the amount that Medicaid would actually pay (reimburse) for a prescription. This amount may be a lesser amount than what Senior Care invoiced when Medicaid was involved. Based on their understanding of the contractual provision, the Nursing Homes argued that the invoices were in excess of the amount they agreed to pay under the contract.
Once it became apparent that the parties would be unable to resolve their different understandings of the contract term, Senior Care filed its complaint, alleging one count of breach of contract and one count of open account. The Nursing Homes filed their answer, denying (1) that they had failed to pay in accordance with the agreement, (2) that Senior Care had billed in accordance with the agreement, and (3) that the amounts billed were based on an agreed-upon sales price. Additionally, the Nursing Homes raised several affirmative defenses. The underlying theory of the affirmative defenses was that Senior Care had not billed pursuant to the term of the contract as the Nursing Homes understood it. They alleged (1) that Senior Care had waived its rights under the contract by breaching the pricing term, (2) that Senior Care had failed to fulfill the conditions precedent by sending improper invoices, (3) that the Nursing Homes had fully paid for the medications based on the terms of the contract, and (4) that Senior Care was precluded from alleging a breach of the contract by the Nursing Homes because Senior Care breached the contract first by sending invoices for amounts that exceeded the agreed-to price. It is clear from the pleadings that the issue to be resolved by the trial court was the meaning of the contractual term “current usual and customary charge to Medicaid.”
Prior to trial, the trial court determined that the contractual term was ambiguous. The court concluded that the term was susceptible to two potential meanings and that parol evidence would be received to determine the intent of the parties. The case then proceeded to a jury trial on the two counts. At issue in the breach of contract claim was the meaning of the pricing provision of the contract and once that was determined, the amount of damages, if any, that Senior Care should recover for the Nursing Homes’ failure to meet their contractual obligations.
At trial, witnesses for Senior Care testified as to the meaning of the term “current usual and customary charge.” The evidence presented showed that Senior Care believed that term to mean the actual amount it charged Medicaid, which was the average wholesale price (AWP), a figure provided by a national data service, less 10% plus a $4.75 dispensing fee per prescription. Senior Care showed that this was the charge it submitted for the Medicaid-paid medications but also acknowledged that Medicaid did not always pay (reimburse) the full amount invoiced.
To that end, witnesses, including a Senior Care co-owner, testified that Medicaid determines what amount it actually pays (reimburses) for a prescription pursuant to a procedure described in its own pro *877 gram’s handbook.[2] Under the specified procedure, Medicaid reimburses the lesser of the prices resulting from application of three different formulas, one being an AWP formula that is calculated differently than the AWP formula Senior Care uses to invoice Medicaid. According to the Nursing Homes’ evidence, the AWP formula used by Medicaid is AWP less 15.45% plus a dispensing fee of $4.23 per prescription. The other two formulas considered by Medicaid in arriving at its reimbursement price are the wholesale acquisition cost (WAC) and the maximum allowable cost (MAC). Because Medicaid pays (reimburses) the lesser of the three prices resulting from these formulas, in some instances the amount actually paid by Medicaid may be less than the amount billed by Senior Care.
While •witnesses for both parties agreed with the above described explanation of how Medicaid determines the amount it actually pays for a prescription, the parties differed as to whether the price they agreed upon in their contract was actually the AWP formula charged by Senior Care or the amount reimbursed by Medicaid. Representatives from the Nursing Homes did acknowledge that they had received medications for which they owed something, but they insisted that such did not amount to a breach of contract because the amounts invoiced exceeded the prices they agreed to pay in the contract.
At the conclusion of all the evidence, Senior Care moved for a directed verdict on both the breach of contract and that amount of any resulting damages, but the trial court initially denied the motions. However, in considering the jury instructions a lengthy discussion ensued regarding the status of the case. Counsel for the Nursing Homes suggested to the tidal court that if the jury agreed with them on the meaning of the contractual term — that it was the actual amount reimbursed by Medicaid after Medicaid applied its three formulas — a $0 verdict would have to be entered because Senior Care had failed to present any evidence from which the jury could determine damages. Counsel for Senior Care, on the other hand, argued that because it was the Nursing Homes’ position that the contract provision meant the amount Medicaid actually paid, it was the Nursing Homes’ burden to present evidence that would provide the jury the basis for determining damages based on that theory. Senior Care then moved to amend its motion for directed verdict, asking that the trial court determine that there had been a breach of the 'contract leaving only the issue of damages to be considered by the jury.
The trial court agreed with counsel for Senior Care and essentially entered a “directed verdict” on liability. The trial court did not specifically grant the motion, but by its ruling on the jury instructions, it is clear that the trial court concluded that the Nursing Homes had breached the contract. That is, the jury was instructed how to calculate damages if it agreed with Senior Care’s interpretation of the pricing term of the contract and how to calculate damages if it agreed with the Nursing Homes’ position. The jury was not asked if there had been a breach of the contract. During the discussion, the trial court noted that there was a contract, that Senior Care had performed under the contract, and that the Nursing Homes had acknowledged that they owed some amount for the products they received under the contract. The court therefore concluded that the Nursing Homes had admitted to breaching *878 the contract and that the only remaining issue was damages.
The trial court further reasoned that because the' only evidence presented to the jury of how to calculate the damages was Senior Care’s version of the AWP formula (AWP - 10% + $4.75) and Medicaid’s version of the AWP formula (AWP - 15.45% + $4.28), the jury had to determine which interpretation to give to the contract term and then apply the associated formula and ascertain the amount of damages.
Therefore, when the trial court charged the jury as to the meaning of the term “current usual and customary charge” for this contractual relationship, the court instructed that if the jury agreed with Senior Care that the contract called for the prescriptions to be priced at the normal charge it made to Medicaid (AWP -10% + $4.75), then the damages would be $1,249,720.26. The trial court further instructed the jury that if it agreed with the Nursing Homes’ definition of the contract price — the amount Medicaid actually pays for such a prescription — the damages would be $1,249,720.26 “less [5.4%] of the total amount billed, less an additional [$.52] for each hundred thousand prescriptions filled.” This instruction was based on the trial court’s conclusion that the only evidence of the amount actually paid by Medicaid was the Nursing Homes’ version of the AWP formula.
The jury returned a verdict adopting the Nursing Homes’ interpretation of the contract pricing term and awarding damages as calculated under Medicaid’s AWP formula. This damage calculation was consistent with the trial court’s instructions.
On appéal, the Nursing Homes argue that the trial court erred in entering a directed verdict as to the breach of contract issue. The Nursing Homes maintain that the pricing term was an essential part of the contract and that until the jury decided which interpretation applied, neither the jury nor the court could determine if there was a breach. We agree.
Until the jury determined the meaning of the pricing term of the contract and what amount was owed pursuant to the contract, it could not make a finding as to whether the Nursing Homes had, in fact, breached the contract by failing to pay that amount. Had the jury found that Senior Care’s version of the AWP formula was the proper interpretation of the contract’s pricing term, the breach of contract and the damages would have been proven. However, if the jury were to find — as it ultimately did — that the contract’s pricing term meant the amount actually paid by Medicaid, then the jury could not determine if, in fact, the Nursing Homes had breached the contract because it was not presented any evidence as to what would be the prices under the WAC and MAC formulas.[3] Without evidence of all three formulas, the jury could not ascertain the actual amount reimbursed by Medicaid and consequently could not determine if the Nursing Homes had breached by failing to pay that amount.[4]
*879 The Nursing Homes further argue on appeal that the trial court erred in concluding that the burden for providing the evidence of all three formulas belonged to them. The Nursing Homes maintain that it was Senior Care’s duty to present evidence that would enable the jury to determine, first, whether there was a breach of contract and second, the amount of any damages that may have resulted. Again, we agree.
“It is well-settled in Florida law that the plaintiff is required to prove every material allegation of its complaint which is denied by the party defending against the claim.” Berg v. Bridle Path Homeowners Ass’n, 809 So.2d 32, 34 (Fla. 4th DCA 2002). Furthermore, “[i]t is ... the plaintiffs burden in a case to establish proof of damages by competent evidence.” R & B Holding Co. v. Christopher Adver. Grp., 994 So.2d 329, 335 (Fla. 3d DCA 2008). Senior Care’s failure to present evidence of all three formulas employed by Medicaid in arriving at the amount it pays for prescriptions not only precluded the jury from determining whether the Nursing Homes breached the contract, it also limited the jury’s ability to calculate the amount of damages that should be awarded if in fact there was a breach.[5]
Because the trial court erred in entering the directed verdict as to the breach of contract, we reverse the final judgment and the finding that Senior Care was the prevailing party, and we remand for further proceedings consistent with this opinion. We do note that in any further proceedings, the definition of the contractual term “current usual and customary charge to Medicaid” has been determined by the jury’s verdict.
Reversed and remanded.
NORTHCUTT and WALLACE, JJ., Concur.

. The prescriptions at issue in this case were to be used by the Nursing Homes’ residents who were covered by Medicare. Medicare pays a per diem amount to the Nursing Homes for each resident's care, and the Nursing Homes are responsible for providing the prescribed medication to the resident. Accordingly, the contracts to purchase the medications are between Senior Care and each individual Avante Nursing Home.

. See Florida Medicaid Prescribed Drug Services Coverage Limitations and Reimbursement Handbook (2001).

. During their case, the Nursing Homes attempted to enter into evidence a computer compilation showing the prices for each of the prescriptions under each of the three formulas that are used by Medicaid. However, upon objection by Senior Care the compilation was excluded. This was the only evidence of the application of the WAC and MAC formulas. The Nursing Homes challenge the trial court’s exclusion of this evidence. However, our disposition here moots that issue, and we do not address it.

. The trial court also entered directed verdicts against the Nursing Homes on each of their affirmative defenses. Since the jury had not yet determined the amount that Senior Care was entitled to charge under the contract, the directed verdict on the Nursing Homes’ affirmative defense that Senior Care breached the contract first by overcharging was also premature. However, the Nursing Homes did not put forth this argument on appeal.

. We note that the trial court was given the opportunity to resolve these issues when the Nursing Homes filed their posttrial motions for directed verdict and new trial on damages. The trial court denied both motions: however, these rulings have not been challenged on appeal.